AUGUSTA RICHARDSON, Administratrix of Estate of DAVID P. RICHARDSON, Appellant, v. JOHN DELL and JOHN DEE.

Division One, July 11, 1912.

**MINES AND MINING: Contract: Construction: Revocation.** A contract for the sale of mining property provided that the title should not pass until the full purchase price had been paid, and that the deed should be placed in escrow. Monthly and yearly payments were provided for with the express provision, further,

that the failure to make any three of such monthly payments, or any yearly payment, should immediately and *ipso facto* render the contract void, all amounts previously paid by the purchaser to be forfeited, all rights under the contract lost to the purchaser, and all proceeds from the property to be retained by him. *Held,* that the purchaser had the right to abrogate the contract at any time without being liable for any further payments upon the purchase price.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Williams,* Judge.

AFFIRMED.

*Joseph Wheless* for appellant.

Dell and Dee conspired together to obtain the title to the lands in Mexico, and succeeded in their plot. Plaintiff elects to allow the title to stay where they put it, and to be compensated in damages for its value. Under all authorities she is entitled to judgment. "The testimony showed beyond all question that the sale was brought about by the defendant for the purpose of acquiring title, and no other. . . . It is needless to cite authority to sustain the self-evident proposition that equity will grant relief by taking away from her a title tainted in that way." Stitt v. Stitt, 205 Mo. 155; Angle v. Railroad, 151 U. S. 1; Leahey v. Witte, 123 Mo. 207; Stephenson v. Smith, 7 Mo. 610; Damschroeder v. Thias, 51 Mo. 100; Keech v. Sandford, Sel. Cas., Ch. 61; McCourt v. Singer, 145 Fed. 108; Land Co. v. Comm. Co., 138 Mo. 439; Hampton v. McClanahan, 143 Mo. 501; Cook v. Basom, 164 Mo. 594; Thomas v. Railroad, 62 Fed. 818; Consolidated Co. v. Murray, 89 Fed. 827; Railroad v. McConnell, 82 Fed. 71; Gore v. Condon, 87 Md. 368; Bitterman v. Railroad, 205 U. S. 207; "Case & Comment," Feb., 1908, p. 123; Trust Co. v. Railroad, 163 U. S. 31; Phillips v. Hardenburg, 181 Mo. 463; Hewitt v. Price, 204 Mo. 31; Guinan v. Donnell,

201 Mo. 175; Curtis v. Sexton, 201 Mo. 217; Tetley v.
McElmurry, 201 Mo. 382; Hagan v. Bank, 182 Mo.
319; Stark v. Love, 128 Mo. App. 24; Kendrick v.
Ryus, 225 Mo. 150; McLain v. Parker, 229 Mo. 68.
"Whatever we may think of them separately, when
we take them up as distinct charges, they are alleged
sufficiently as elements of a scheme. It is suggested
that the several acts charged are lawful and that in-
tent can make no difference. But they are bound to-
gether as the parts of a single plan. The plan may
make the parts unlawful." Swift v. U. S., 196 U. S.
395; Lowe v. Lawlor, 208 U. S. 274; Kilpatrick v.
Wiley, 197 Mo. 159. "The very plot is an act in it-
self." Aikens v. Wisconsin, 195 U. S. 194.

*Jamison & Thomas* and *Blevins & Jamison* for
respondents.

(1) There is no evidence in the case of conspiracy
or fraud on the part of respondents Dell or Dee. Dell
was under no moral or legal obligation to Richardson
to protect Richardson's title to said mining properties
or make payments thereon for Richardson's account.
(a) Dell, having done those things which he had a
legal right to do, cannot be said to be guilty of fraud
or conspiracy. Nations v. Pulse, 175 Mo. 86; Bank
v. Guthrey, 127 Mo. 193; Butler v. Manny, 52 Mo. 504;
Stewart v. Severance, 43 Mo. 322; Hunt v. Simmons,
19 Mo. 583; Graham v. Carondelet, 33 Mo. 262; Hutch-
ins v. Hutchins, 7 Hill (N. Y.), 104. (b) Dell made no
promise to, or contract with, Richardson to make the
payments to Mrs. Dee and John Mann. If appellant has
any cause of action in the premises, it is against the
Cacoma Mining & Smelting Company. (2) If the con-
tracts of the Cacoma Mining & Smelting Company
were valid and there was no forfeiture by Richardson
of his deed from Mrs. Caroline Dee and John Mann,
and the title to the properties remained in said com-

pany, appellant cannot recover. The conveyances of said property by Mrs. Dee and John Mann to Dell, under such circumstances would be subject to the title of said company thereto, as Dell had notice of its claim. Randolph v. Wheeler, 182 Mo. 145; Hayman v. Schaffner, 88 Mo. 24; Foote v. Clark, 102 Mo. 394.

BROWN, C.—The Cacoma Mining & Smelting Company is an Arizona corporation, organized in August, 1904, for the purpose of acquiring, buying, selling and owning property of every kind, and doing a mining, concentrating and smelting business for pecuniary profit and purposes of gain. It had an office in the city of St. Louis where meetings of its board of directors were held and its general executive business transacted, and which is, in the petition, called its principal office. It was engaged in the business of mining near Autlan in the Republic of Mexico, where all its mining property was situated, and where the defendant Dee, its vice-president and general manager, resided. The testator, David P. Richardson, of St. Louis was, so far as the record shows, its first president, and was succeeded by the defendant Dell, also of St. Louis, who purchased a large amount of his stock from Richardson. The defendant Dee describes himself as "one of the founders and half owner" of the company. Although the record is meager, it is fair to presume that these two were the originators and promoters of the corporation. After the organization of the company, and during the month of November, 1905, Richardson acquired, by a contract of purchase not set forth in the abstract, from the defendant Dee and his wife, the latter of whom was the owner, a mine at Autlan called the "Volcancillo" or "Buenavista;" also, by a similar contract, from one John Mann a group of six other mining claims, together with an undivided one-fourth interest in the mine "Veta Grande," the other three-fourths of which

was the property of the company. These properties seem to have largely constituted the prospective value of the company.

The petition states, in substance, that the plaintiff is the widow of David P. Richardson, and had been duly appointed administratrix with the will annexed of his estate; that Dell was and at all times therein mentioned had been the president of and a large stockholder in the Cacoma Mining & Smelting Company; that Dee was and is its vice-president and general manager, and that Richardson was also a stockholder and member. of its board of directors; that by the terms of their purchase from Mrs. Dee and Mann of the mining properties before mentioned he was to pay each of them, besides certain cash payments, one hundred dollars per month; that the contracts of purchase provided that if default should be made for three months in either case the contract of purchase should be forfeited and the title revert to the respective vendors; that on or about the 9th of October, 1906, Richardson made certain contracts by which he sold all said mining properties to the company for $75,000; being $25,000 for the "Volcancillo;" $25,000 for the group of six mines and $25,000 for his one-fourth interest in the "Veta Grande." Said gross amount was to be paid in monthly installments of six hundred dollars, beginning November 1, 1906, on the first day of each month until said sum should be paid in full; and in addition to said installments the sum of seven thousand five hundred dollars at the end of the first year, and thirty thousand at the end of the second year, and the full amount remaining unpaid at the end of the third year; and that the failure to make any three of such monthly payments should render the contract and conveyance void. That the company in said contract expressly assumes the payments due from Richardson to Mrs. Dee and Mann under his

245 Mo.—21

contracts of purchase and agreed to pay the same regularly as they should become due. That to carry out this purpose a trust agreement was made between the parties to said contract and the Commonwealth Trust Company of St. Louis, by which all payments by the mining company were to be made through the trust company, which was in return to pay the two hundred dollars per month to the said original vendors respectively as provided by their contracts of sale, which arrangement was agreed to and ratified by them, all of which was known to the defendants, the defendant Dell having acted for the mining company in said transactions; that the Volcancillo mine was then extensively worked, and producing large quantities of rich and valuable copper ores which, to the value of many thousand dollars, were ready for shipment and sale, and other large quantities of such ores were ready to be brought to the surface and sold at great profit, all of which would have enabled the company to meet its payments; and that the defendant Dell agreed that if the expected returns were not available in time for said payments he would advance the money necessary to make them until such returns should be received; that on or about January 1, 1907, Dell paid to the trust company five hundred dollars, having previously paid to John Mann three hundred dollars, covering the first three monthly payments for Richardson, and remitted to Mrs. Dee $100, and the remaining $400 was paid to Richardson by the trust company. That immediately after the execution of the contracts, Richardson became fatally ill and was confined to his bed and unable to attend to any business until the second day of February, when he died.

That during the last illness of Richardson defendants conspired together to bring about a forfeiture of the contracts with Dee and Mann for the purpose of wrongfully depriving the mining company as well as said Richardson of said properties, and the proceeds

thereof, for the purpose of securing the title to said mines to said Dell, knowing that Richardson was without means to keep up his payments, unless the payments to him by the mining company should be promptly made, and that the said properties would then be forfeited to Mrs. Dee and Mr. Mann. That in furtherance of this plan and conspiracy, Dell, during the month of January, 1907, procured Dee to come to St. Louis, first obtaining from his wife and Mr. Mann full and general powers of attorney with reference to said mining properties and contracts. That before leaving Autlan and on January 12, 1907, he did procure such powers and came to St. Louis, and in pursuance of such conspiracy it was arranged by them that the payment of $100 due Mrs. Dee on February 1, 1907, should not be in fact paid, but should be pretended to be tendered to and refused by Mrs. Dee, and that thereupon the defendant Dee should, in pursuance of his said powers, declare a forfeiture of said properties, and should thereupon convey the same to the defendant Dell for his own use and profit. That Dell represented that he did in fact send the one hundred dollars then due to Mrs. Dee, and that she refused to accept the same; and thereupon he refused, either with his own money or the money of the mining company, a sufficient amount of which was then in his hands for that purpose, to make the payment to Richardson, and purposely disabled the mining company from making such payments by causing its work to be suspended and its ore shipments discontinued and thereupon in further execution of such conspiracy Dee, as attorney in fact for his wife and Mann, declared in their names a forfeiture to them on February 13, 1907, and thereupon conveyed under his said power the property to Dell.

The plaintiff asked judgment for seventy-four thousand two hundred dollars, which is the amount unpaid to Richardson upon his contract to sell to the

company, which he also alleges to be the fair and reasonable value of the properties.

The consideration of the sale to Dell was $12,500 to Mrs. Dee and $8,500 to Mr. Mann which was the same amount due on Richardson's contract of purchase from the same parties.

Both parties admit in their briefs that, at the time the forfeiture was declared and the same property was conveyed to Dell, no forfeiture had accrued under the terms of Richardson's contract of purchase. The defendants filed separate answers, that of Dee being simply a general denial while the defendant Dell's answer, in addition to the general denial pleaded the failure of the Cacoma Mining & Smelting Company to file in the office of the Secretary of State of Missouri a copy of its charter and other matters required by the Act of April 24, 1903, and to secure the certificate required by said act, so that its contracts mentioned in the petition are utterly null and void, and no action can be based thereon. It also pleaded that he had been induced by Richardson to purchase two thousand and fifty shares of the capital stock of the mining company and to pay therefor the sum of thirteen thousand dollars by false and fraudulent representations as to the description and value of the property of said company set forth in the answer, and had, by the same means, induced the company to enter into the agreement to purchase the mining properties described in the petition, and had in the same manner induced Dell to advance and invest the further sum of ten thousand dollars in the company. These statements were put in issue by replication.

The contract of sale by Richardson to the company states that the said Richardson "for and in consideration of the several sums of money to be paid, and of the several agreements and undertakings of the said party of the second part, as hereinafter set

out, does hereby sell, convey and transfer to the said Cacoma Mining and Smelting Company, its successors and assigns, all and every, his right, title and interest in and to the following named and described mines and mining properties." A statement of the title to each claim of his grantors, Mrs. Dee and John Mann respectively, is then given, together with a description of the deeds to himself. The consideration is stated to be seventy-five thousand dollars. gold, distributed as follows; the Volcancillo or Buenavista, twenty-five thousand dollars; the group of six properties described in the petition, twenty-five thousand dollars; and the one-fourth interest in the Veta Grande, twenty-five thousand dollars. The instrument provided for the payment, beginning November 1, 1906, of two hundred dollars per month on each of the three sums above named during the entire period, and the further sum of twenty-five hundred dollars on each of the three properties at the end of the first year; ten thousand dollars on each at the end of the second year, and at the end of the third year the full amount then remaining unpaid. If the first yearly payment should not be paid when due the time was to be extended for the company an additional six months; and if the second annual payment should not be made when due it might have a further extension of one year to make said payment; but it expressly provided, "that the said monthly payments of $200 each on each said principal sums above mentioned shall be made regularly and punctually when due, without default or extension of time; it being expressly stipulated that the failure to make any three of such monthly payments, whether consecutively or cumulatively, on any one of said principal sums, or the failure to make any of said yearly payments within the limit of the extensions herein provided, shall immediately and *ipso facto* render this contract and conveyance null and void and of no legal effect what-

ever, and any and all amounts paid hereunder by said second party shall be forfeited and remain the property of said first party, and all rights under this contract shall be entirely lost to the said second party and revert to the party of the first part.'' The company was to have possession of the property upon the execution of the contract and might proceed to operate the same for its own use without being required to make any account, upon the termination of the contract, for the proceeds, and was to pay all taxes and other charges. The closing paragraph was as follows: ''It is further agreed and understood that the title in and to all the above mentioned properties shall remain in the party of the first part and shall not pass to the second party until the several payments hereinbefore provided for shall have been fully made and satisfied; and that this conveyance shall remain in escrow in the hands of some person to be agreed upon, pending the compliance by the second party with the terms and conditions hereof, and upon the full performance of the same, this conveyance shall be delivered to the said Cacoma Mining and Smelting Company, its successors or assigns.''

The Commonwealth Trust Company was chosen by the parties to this contract as depository under its terms, and a tripartite agreement of escrow was executed, which, after reciting the provisions of the contract of sale contains the following paragraph:

''Out of the several payments from time to time received by said Trust Company from said Mining Company to the credit of the said David P. Richardson, it will on the first day of each month, or at such times as it may receive the said payments, promptly remit in separate drafts, one payable to Mrs. Caroline Blake de Dee and the other to John Mann, both in the city of Autlan, State of Jalisco, Mexico, monthly payments of $100 each, and upon receipt of the said yearly payments above mentioned will remit to each of said

persons a sum equal to twenty (20%) per cent of the amount then remaining due on the sum of $12,500 gold payable to said Mrs. Dee and the sum of $8,500 gold payable to said Mann, the third and last payment to be for the full amount of balance remaining due to each.''

It also provided for the delivery of the deed to the mining company upon the completion of the payments, which were all to be made to and through the depository, which charged for its services $100.

Mrs. Dee, on November 13, 1906, by an instrument of writing ratified these two contracts stating ''she makes them hers in all their parts;'' and Mr. Mann gave his receipt, November 24, 1906, as follows: ''Received from Cacoma Mining & Smelting Co. through John Dee, vice-president of said company, the sum of three hundred dollars U. S. Currency ($300.00) for the monthly payments of November and December, 1906, and the month of January, 1907, as per agreement between D. P. Richardson, John Mann, the Cacoma Mining and Smelting Company, and now a matter of escrow with the Trust Company of St. Louis, Mo., U. S. A.'' In October, 1906, the defendant Dee made a report signed by him as general manager of the Cacoma Mining & Smelting Company, with a description of its properties and mines located in the state of Jalisco, Mexico; showing the extent of workings and machinery on the Volcancillo, and that there had been blocked out and put in sight 100,-000 tons of rich ore; that all material taken out had been paying ore, and that there were then on the dump 1000 tons of ore taken from those shafts, averaging fifteen per cent copper, or 150 tons of metallic copper, to say nothing of gold and silver values. ''That is, there is now, figuring copper at seventeen cents, $51,000 in gold and silver values. Concentrated at twenty per cent this ore will net at the mine a profit of eighty dollars per ton of concentrates, or 750 tons

of concentrates at eighty dollars per ton profit, or $60,000 in cash awaiting the concentration of the ore. . . . There are forty tons of twenty per cent concentrates that will be shipped in a few days at a price that will net $3200 profit. . . . After making an exhaustive examination of the 'Volcancillo,' the American Smelting Company made a contract with the company for ten tons of twenty per cent concentrates per day, or as much more as can be furnished, at a price per ton which will net a profit of eighty dollars per ton." At the end of this report were written by Mr. Dell the following words: "Mr. Dudley, you can hand this around until we can get some printed. J. D."

Mr. Dell testified that he never read the report. He said Mr. Dee "wrote out something. I don't remember what it was. He wrote out glittering generalities. I don't know." The following question and answer in Mr. Dee's testimony express his opinion of it. "Q. Eleven. Do you mean, then, that this written statement, made by you, is false, and devised to deceive prospective purchasers of stock? A. Yes." In his cross-examination on his own behalf he took up each of the statements we have quoted from the report and said that they were each and all untrue; that he wrote it at Mr. Wheless's suggestion, by whom it was revised. He also testified that the ore contracts referred to in the report were of no value whatever.

On January 4, 1907, at a meeting of the board of directors of the mining company held in St. Louis, at which Mr. Dell, the president, was present not only for himself but representing the defendant Dee, another director, by proxy, Mr. Richardson being represented through his proxy by Mr. Wheless, Mr. Dell introduced, Mr. Wheless seconded and the board unanimously adopted a resolution as follows:

"The president is hereby authorized and also instructed to take up the obligations of the company in its contract with D. P. Richardson for the amounts due under the contract as they may mature, and for any sums advanced for this purpose by him or any other party, or parties, he is instructed and authorized to issue the note of the company for the said amount with interest from date that the payments are made."

On the 23d of the same month, Mr. Wheless being present and acting secretary, Mr. Dell offered and the board unanimously adopted the following resolution: "Resolved, That the president be authorized to telegraph to Mr. Dee to come at once to St. Louis on important business of the company."

On February second, the date of the death of Mr. Richardson, Dee arrived with his powers of attorney as stated in the petition. On February 13, 1907, the defendant Dee as attorney in fact for Mrs. Dee and John Mann respectively, directed a notice to the Cacoma Mining & Smelting Company, reciting the deed from Richardson to the company of October 9, 1906, and declaring that "more than three monthly payments have become due and payable to the undersigned (Mrs. Dee and John Mann) from your company, to-wit, the respective payments of $100 due to the undersigned on November 1, 1905, December 1, 1906, January 1, 1907, and February 1, 1907. . . . You are, therefore, notified that the undersigned has declared forfeiture and cancelled and does hereby forfeit and cancel the said above mentioned contracts and conveyances. . . . You are further notified that the undersigned will immediately take possession of all of said properties of his former right, free and clear of said contracts and conveyance above set forth." And on the 16th of the same month he executed a contract of sale for Mrs. Dee to the defendant Dell for the same property and for the same amount

that was due from Richardson under his contracts or conveyances of August, 1905. This contract purported to sell, grant and convey, in the name of Mrs. Dee "all dominion, possession and usufruct which his grantor has in the following mining properties:" (Here naming and describing the entire eight properties named in the petition.)

On the same date Dee as attorney in fact for Mann executed an instrument to Dell reciting Richardson's deed of October 9, 1906, the agreement with the Commonwealth Trust Company of that date, the declaration of forfeiture of February 13, 1907, and the deed of February 16, 1907, of Mrs. Dee to John Dell and fully ratifying the same and providing for the payment by Dell of the sum of $8500 therein agreed to be paid for the six mines, and subrogating Dell to all the rights which Mann had under Richardson's deed to the Cacoma Company.

The evidence tended to prove that Dell had stated that these contracts were for his own personal use and benefit.

At a meeting of the board of directors of the company held on the nineteenth of the same month, Mr. Dell, who was presiding, made a formal statement in writing to the board containing the following paragraph: "I have repeatedly warned you that I would not and could not individually keep up these payments. Consequently, the amount due on the first day of February under contract with D. P. Richardson was not made and the contract was violated. Since then the company has been notified this contract has been forfeited and cancelled for want of the payments required under it."

The evidence tends to prove that at the meeting of January 23, 1907, Mr. Dell had stated to the board that he was going to send some money to Mrs. Dee but would not make any payment to Mr. Richardson.

A jury was waived and at the close of the evidence the court at the request of each defendant declared as a matter of law that the finding must be for such defendant. After duly excepting, the plaintiff suffered a nonsuit and after an unsuccessful motion to set it aside prosecutes this appeal.

## OPINION.

Whatever is involved in this suit grows out of the contract between Richardson and the Cacoma Mining & Smelting Company dated October 1, 1906, by which he sold or agreed to sell to it his mining properties in Mexico. The meaning and effect of that contract lies at the foundation of every question in the case. It not only provides in terms that the property which it affects shall not pass until fully paid for, but it is placed in escrow with the Commonwealth Trust Company to be delivered only upon the full performance of its terms. The written contract with the depository is a part of the transaction and must be read in connection with the contract of sale. No interest which Mr. Richardson may have had in the property which would have otherwise passed to his heirs at his death was conveyed by these instruments. Nor did the conveyance by Mrs. Dee to the defendant Dell, in which Mann concurred by a separate deed, deprive Mr. Richardson of any title or interest he may have had in the property. It could only operate under the circumstances to release such title or interest as the grantors had and to substitute Mr. Dell for themselves in their relation to Richardson.

It follows that the real foundation of the controversy is the purchase price reserved in the contract between Richardson and the Cacoma Company, and that Mrs. Richardson, as the administratrix with the will of her deceased husband annexed, is the proper

party to sue with reference to it; and she asserts that
defendants are liable to her in damages because they
have wrongfully deprived her of it by acts which she
characterizes as conspiracy and fraud. She says that
her debtor owed her a large amount of money; that it
was solvent and amply able to pay the whole amount;
that defendant Dell as its president, and defendant
Dee as its vice-president and general manager, con-
spired together to so manage the debtor corporation
as to render it utterly unable to pay, and by that
means to deprive her of the entire purchase price, as
well as to acquire the property for Dell to the exclu-
sion of the corporation of which he was president.
Were this all true; and should such a scheme be con-
summated, there should be some redress. [Angle v.
Railroad, 151 U. S. 1.] In that case it is said: "It
has been repeatedly held that, if one maliciously in-
terferes in a contract between two parties, and in-
duces one of them to break that contract to the injury
of the other, the party injured can maintain an action
against the wrongdoer." Although in the case at
bar the solvency of the debtor corporation was amply
shown by a report upon its condition signed by one
of the defendants and circulated upon the written
direction of the other, they now say in substance that
the statements were untrue and intended to deceive,
and that the company was in fact unable to pay; but
it is admitted that its mines were shut down by them
and payment upon the Richardson purchase stopped;
that a forfeiture was declared through the defendant
Dee by Richardson's vendors at a time when they
now admit in their printed arguments that no for-
feiture had accrued; and that defendant Dell be-
came the purchaser, and was at the time of the trial
claiming to be the owner of the property.

The defendants now claim that all this worked no
injury to the plaintiff or her testator; that under its
contract of purchase from Richardson, the Cacoma

Company owed nothing, because that contract liqui-
dated the damages that might be recovered for a
breach of the promise to pay installments of the pur-
chase price, to a sum which had already been paid.

It is, no doubt, the general rule to consider
clauses of forfeiture and nullity for nonpayment of
rent or installments of purchase price as additional
security for such payments to be made available at
the option of the lessor or vendor, and in most cases
this construction accords well with the terms of the
contract and the evident intention of the parties. But
in many cases there are elements of injury in mere
delay for which such a rule makes no provision, and
which it is necessary to foresee and for which the par-
ties should provide; and there are no cases in which
these questions become more difficult of solution than
those involving the sale or lease of property to be de-
veloped and used for mining purposes, in which the
purchaser or lessee frequently takes upon himself a
burden of unremunerative labor, which, after strain-
ing his resources to the unmost, sometimes changes
almost instantaneously to a source of immense profit.
In providing for such contingencies, prudence indi-
cates that damages should be liquidated in such a way
as to produce the fairest results with the least danger
to the parties. We find two illustrations of these
methods in the contract now before us. The damages
of the vendor are liquidated by a forfeiture of all
amounts paid up to the time of default, so that the
vendee escapes with a burden which he has already
sustained to its full extent. The loss which the ven-
dee may have sustained in the development of the
property is liquidated by the returns already pro-
duced by the work done. In such a case it would be
obviously unjust for the vendor, as his monthly and
yearly installments of purchase money become due,
to sue and recover judgment for each until the re-
sources of the helpless purchaser should become to-

tally exhausted, and the way open to take the property itself by the forfeiture "nominated in the bond;" and it would obviously add to this injustice to compel the purchaser to account for such mineral as he might from time to time have discovered and taken out to lessen the burden of his work. In this contract the parties have seen fit to liquidate their damages in both these respects. It provides for the purchaser as well as the seller and the question is whether apt words have been used for the protection of both. In Sigler v. Wick, 45 Ia. 690, the Supreme Court of that State said: "The question here presented cannot well be determined upon the authority of the adjudicated cases, because it rarely occurs that contracts of this character are precisely similar in terms. The contract is unlike that construed in Bradford v. Limpus, 10 Ia. 35. In that case the contract provided that if the purchaser should fail to pay the first deferred payment, the vendor should take possession and repay to the purchaser $500 of the $1700 which was paid in hand." It then proceeded to hold that in the case it was considering the condition of forfeiture was simply an additional security for the vendor, while in the Bradford case the damages were liquidated with the intention of protecting the purchaser as well, and permitted him to introduce the defense of forfeiture against a suit for purchase money. In the case now before us the contract, as we have already seen, provides distinctly that the title to the property shall not pass until the entire amount of the purchase price has been paid, and also specifies that the deed shall be retained in the hands of the depositary as an escrow. These provisions amount simply to an agreement to convey when the purchase price shall have been paid. Until the happening of that event the title remains in the grantor, and upon his death it descends to his heirs subject to the equitable interest created by the contract of sale. As

further security a fund was to be created (and its accumulation was actually begun), consisting of $600 per month, which was to be forfeited without any regard to the amount of actual damages involved, upon the failure of the purchaser to pay according to the terms of his agreement. This fund, without rebate or reduction, was to be the property of the vendor upon the breach prescribed for the purpose of the forfeiture; and as a part of the compensation for this it was provided that the purchaser might keep the proceeds of anything which he should take from the mines. These provisions were evidently to be interdependent, each contributing its quota as consideration for the other. They were evidently intended to constitute an entire compensatory scheme, specifying the terms upon which the purchaser might recede from the unperformed obligations of his contract. It was to this end that the contract "expressly stipulated that the failure to make any three of such monthly payments whether consecutively or cumulatively, on any of said principal sums, or the failure to make any of said yearly payments within the limit of the extensions herein provided, shall immediately and *ipso facto* render this contract and conveyance null and void and of no legal effect whatever; and any and all amounts paid hereunder by said second party shall be forfeited and remain the property of said first party, and all rights under this contract shall be entirely lost to the said second party and revert to the party of the first part." We note the expression that the delinquency "shall immediately and *ipso facto* render the contract null and void and of no legal effect whatever." It would be difficult to consider a combination of words more expressive of the intention we have already outlined than that last quoted. The expression *"ipso facto"* is a conclusive expression of the intention of the parties to stipulate that no action of either shall be required to bring

about the result, and that the purchaser might at any time discontinue his payments at the cost of the forfeiture absolutely of what it had already paid. The discussion of these words in State ex rel. v. Lansing, 46 Neb. 514, is interesting and leads inevitably to the conclusion which should be the end of such discussion generally, that they mean what they say. Their literal translation, ''by the fact itself,'' leaves nothing to be said, but we cannot resist the temptation to add, from the definition of such eminent authority as Bouvier, that ''a proceeding *ipso facto* void is one which has not prima facie validity, but is void *ab initio*.'' We think the nature of the transaction is such as to indicate and call into action the caution which makes one reluctant to assume obligations which can only fail to become ruinous by the intervention of speculative good fortune; that the parties have been fortunate in the choice of words to protect themselves in this respect, so that the Cacoma Mining Company had the right, without giving any reason therefor, to withdraw upon condition of forfeiting all sums that it had already paid; that its *locus poenitentiae* extended only to the time when the three monthly payments should become delinquent, and from that time either party had the right to treat the contract as absolutely nonexistent from the beginning. It being optional with the purchaser whether he should keep up his payments or not, we do not think the administratrix of Richardson has any interest upon which she can maintain this action. This is the view which has been taken by this court whenever the same general question has been before it. [Dunaway v. Day, 163 Mo. 415; Glass v. Rowe, 103 Mo. 513; also Ramsey v. West, 31 Mo. App. 676.] It makes it unnecessary for us to pass upon any of the other numerous questions that have been presented for our determination. Nor do we express any opinion as to the equities of the parties and others with respect to the

property out of which this controversy has grown, leaving them in those respects at liberty to take such steps as may be advised.

The judgment of the St. Louis Circuit Court is affirmed. *Bond, C.,* concurs.

PER CURIAM.—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. All the judges concur.